**SIGNED this 9th day of December, 2011**

_Shelley D. Rucker_
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:                                                        No.  08-16378
                                                              Chapter 7
STEVE A. McKENZIE
a/k/a TOBY McKENZIE,

                         Debtor.

## MEMORANDUM

The law firm of Grant, Konvalinka & Harrison, P.C. ("GKH") filed a motion for relief

from the automatic stay ("Motion for Relief") to be allowed to pursue its rights under a

Membership Interest and/or Stock Pledge Agreement executed by the debtor Steve A. McKenzie

[Doc. No. 1065]. GKH provided legal services to the debtor and his companies prepetition. By

the time the debtor filed for bankruptcy, he had a substantial balance owing to GKH, and he

1

pledged his interests in thirty-nine entities to secure the obligation for legal services and to insure

receipt of additional services up to $750,000 according to the terms of a pledge agreement and its

amendment.  Over two years after this case started, GKH now seeks relief from the stay to

foreclose on its collateral, the debtor's interests in the entities. Several of the entities have been

the subject of hearings in this case; and in two instances, the entities themselves have been

debtors in cases of their own.[1]

The court conducted an evidentiary hearing on the motion on May 24, 2011 ("May

Hearing"), and entered an order on May 27, 2011, resolving part of the issues raised [Doc. No.

1287][2.]  At that time the court held that GKH had the burden of demonstrating that it had a valid

security interest in the equity interests listed in the stock pledge in which it sought to obtain relief

from the stay. The court held that GKH had the burden to show that it had a security interest that

attached to the debtor's property – *i.e.,* that the debtor owed GKH a debt, that he owned the

property to be pledged as collateral, that he could pledge it, that he did pledge it by granting

GKH a security interest in the property by a written security agreement, and finally that the

property pledged was identifiable. The court found that GKH had met the requirements of

demonstrating that it was owed a debt, that it had obtained a writing signed by the debtor

granting a security interest in a number of equity interests and that those interests, except for two,

were sufficiently described to allow the property to be identified. The court reserved the issues of

what rights the debtor had in the collateral and whether those rights could be conveyed.  In

---

[1]  *In re Village Lanes, LLC,* Case no. 09-15086 (Bankr. E.D. Tenn.)(debtor dismissed August 30, 2010); *In re McKenzie Development, LLC*, Case no. 08-13486 (Bankr. E.D. Tenn.)(debtor dismissed December 16, 2008). GKH served as counsel for the debtor in *In re McKenzie Development, LLC.*
[2]  The hearing was originally scheduled for April 5, 2011 [Doc. Nos. 1130, 1145]. Upon the motion filed by counsel for the trustee, the court entered an order continuing the hearing to May 4, 2011, and it was further continued to May 24, 2011, by agreement of the parties.[Doc. No.1145,1207, 1250, 1251, and 1279]

addition, the court reserved the issue of whether the trustee could use his status as a hypothetical

lien creditor or as the holder of avoidance powers defensively. If the status and powers could not

be used defensively, the court also reserved the issue of whether the statute of limitations to

bring avoidance actions should be tolled in this case; and if so, whether the stay should be lifted

to allow GKH to foreclose when its lien was avoidable. The evidentiary hearing on those

reserved issues was held on October 24, 2011 ("October Hearing").

### I.      Previous Findings

For ease of reference, the court repeats its previous findings of fact from the May

Hearing. Unless otherwise indicated, docket numbers refer to docket entries in this bankruptcy

case, Case No. 08-16378.

This case began as an involuntary petition filed against Steve A. McKenzie on November 20, 2008. The involuntary case was followed by a voluntary Chapter 11 petition, Case No. 08-16987, filed on December 20, 2008. The voluntary case was consolidated with the involuntary case on January 16, 2009, and proceeded as a Chapter 11. In the order consolidating the two cases, the applicable deadlines of the involuntary case were deemed to be the applicable deadlines in the consolidated case. *Order Consolidating Cases* at 2. [Doc. No. 33] The order for relief in the involuntary case was entered on January 21, 2009. [Doc. No. 39] Mr. Kenneth Still was appointed trustee for the Chapter 11 case on February 20, 2009. [Doc. No. 140]. The case was converted to a Chapter 7 proceeding on June 14, 2010 [Doc. No. 789], and Mr. Still was reappointed as the Chapter 7 trustee. *See* Bankr. Case No. 08-16378, Docket Entry dated 6/14/10. In the Chapter 11 and the Chapter 7, Mr. Scott LeRoy, as general counsel under 11 U.S.C. § 327(a), and Mr. Richard Banks, as special counsel to the trustee under 11 U.S.C. § 327(e), were employed. [Doc. Nos. 238 and 806] More than two years after the date of filing have passed, and more than one year has passed since the appointment of the first trustee in the case.

The meeting of creditors in the Chapter 7 case was set for July 13, 2010. *Amended Notice of Meeting of Creditors dated 6/14/2010* [Doc. No 792]. The notice states on its face:

> Please Do Not File a Proof of Claim Unless You Receive a Notice to Do So.
> However, prior to the meeting of creditors scheduled above, all creditors asserting
> a security interest in property of the debtor or of the estate must provide proof to
> the bankruptcy trustee that the interest has been perfected. See Local Bankruptcy
> Rule 3001-1(b).

*Id.*

On December 17, 2010, the trustee filed a Notice of Need to File Proof of Claim Due to Recovery or Anticipated Recovery of Assets. *Notice of Need to File Proof of Claim* [Doc. No. 949]. It directed creditors who wished to share in any distribution of funds in this bankruptcy case to file a proof of claim with the Bankruptcy Court on or before March 17, 2011. *Id.*

GKH is a creditor in the case. For purposes of this hearing, the parties stipulated that GKH has a past due balance for legal services of $ 486,828.51. According to the exhibits admitted at the hearing, on October 13, 2008, the debtor and GKH executed a Membership Interest and/or Stock Pledge Agreement in which the debtor pledged a number of his equity interests as collateral. *Membership Interest and/or Stock Pledge Agreement*, Exhibit 1 ("Pledge Agreement"). A list of companies attached to the Pledge Agreement reflects the debtor's ownership interest in each company. The court will refer to the companies listed on Exhibit A to the Pledge Agreement as the "A List Interests."

The debtor signed a demand note dated October 24, 2008, payable to GKH for amounts up to $750,000. *Part 2 to GKH Amended Proof of Claim, No. 86-2 at 1*, Exhibit 10, ("Demand Note"). He executed an amended pledge agreement dated October 29, 2008, which pledged additional equity interests including the debtor's interest in Cleveland Auto Mall, LLC ("CAM"). *Amendment to Membership Interest and/or Stock Pledge Agreement,* Exhibit 2 ("Amended Pledge Agreement")[3]

The Amended Pledge Agreement recited that:

> WHEREAS, Pledgee has provided as of the date hereof to the Pledgor and the various companies legal services in the amount of at least $385,000 ("Legal Services"); and
> WHEREAS, in order to induce Pledgee to continue to provide legal services to Pledgor and the Companies, Pledgor has agreed to pledge to Pledgee all of his interests as set forth on Exhibit 'A' for the legal services provided;

*Id.* at 1. The entities listed on Exhibit A were defined as the "Companies." *Id.* The services to be provided would be "in an amount of at least $750,000.00." *Id.*

Like the Pledge Agreement, the Amended Pledge Agreement also had an Exhibit A which listed the interests which were being pledged. The amended list included the A List Interests plus a number of other entity names without the percentages showing the debtor's ownership. (The additional interests are referred to as the B List Interests; and the A List Interests and the B List Interests are collectively referred to as the Pledged Interests. The Exhibit A attached to the Amended Pledge Agreement is the referred to as the Pledged Interests List.)

GKH filed a financing statement with the Tennessee Secretary of State's office on October 15, 2008, and the A List Interests were identified on an attachment titled Exhibit A. *Letter from Tennessee Secretary of State with attached recorded UCC 1 filing for GKH*, Exhibit 4 ("Initial UCC Filing").

On October 27, 2008, GKH amended its financing statement by filing a UCC 3 Amendment to Financing Statement. *Letter from Tennessee Secretary of State with attached recorded UCC 3 Amendment*, Exhibit 3, ("UCC Amendment"). On the UCC Amendment, GKH

---

[3] The court's original findings leave the impression that CAM was included in only the list attached to the Pledge Agreement Amendment which is incorrect. CAM was included with the entities listed on the attachment to the Pledge Agreement. Exhibit 1, Pledge Agreement at 8. It is an A List Interest.

had four options in box 8 of the form to choose from to indicate what sort of amendment it was making to the collateral description. It did not select "deleted" or "added" or "assigned." GKH selected the box which indicated that it was "restating" the collateral description. The new description is "All the membership interests and stock ownership interests of Steve A. McKenzie in the companies listed on Exhibit 'A' attached hereto and made a part hereof." An Exhibit A was attached which listed only the B List Interests.

With respect to the names of the companies listed on the Pledged Interest List, several of the names listed are not the legal names of the entities. At the hearing on the Motion, Ms. Marcia Gilbert, the former chief financial officer ("CFO") of SAM Management, LLC, testified concerning the identity of the companies listed in the Pledged Interest List and on the Initial UCC and the UCC Amendment. The chart below reflects the names which the trustee alleged were lists of the names shown on the Pledged Interests List and the financing statements, compared with the legal names which Ms. Gilbert identified. SAM Management Company has previously been identified to the court in other hearings as the main management company used by the debtor to manage the more than one hundred companies and ventures through which he operated.

| Pledge List Name | UCC Exhibit Name | Legal Name |
|---|---|---|
| Spectrum Health, LLC | Spectrum Health, LLC | Spectrum Health Operations, LLC or Spectrum Health and Fitness, LLC |
| Great Smoky Mountains Development, LLC | Great Smoky Mountains Development, LLC | Great Smokey Mountains Development, LLC |
| McKenzie-Cate Development, LLC | McKenzie-Cate Development, LLC | McKenzie-Cate Company, a Tennessee general partnership |
| Exit 20, LLC | Exit 20, LLC | Exit 20 Properties, LLC or Exit 20 Development, LLC |
| East Tennessee Interstate Properties | East Tennessee Interstate Properties | East Tennessee Interstate Properties, LLC |
| Exit 20 Partners, LLC | Exit 20 Partners, LLC | Exit 20 Partners S/E, LLC |
| Hampton Creek Development, LLC | Hampton Creek Development, LLC | Hampton Creek Development Company, LLC |
| Sam Management, LLC | Sam Management, LLC | SAM Management Company, LLC |

The chart reflects those interests about which the trustee raised the identification issue and the names of similar legal names he identified. *Trustee's Objection to Motion for Relief* at 2-3 [Doc.no.1229]. He also raised the issues with respect to Sam Galaxy Partners, LLC and The Marina at South Bay, LLC. At the hearing, certificates from the Office of the Secretary of State

for the State of Georgia were admitted which demonstrated the existence of these entities and that the names used by GKH on the Pledged Interest List were correct. Exhibits 7 and 8.

The trustee also raised an issue about SAM Investments, GP. On direct examination Ms. Gilbert identified it as an entity owned by the debtor and testified that it was a general partnership. With respect to an entity known as Spectrum Health, Ms. Gilbert did not know if Mr. McKenzie had an ownership interest in such an entity. On cross examination she repeated that she did not know if the debtor had an interest in Spectrum Health, LLC, but that she was aware that the debtor and Mr. Bowers had guaranteed an obligation of Spectrum Health Operations, LLC. In response to questioning about Exit 20, LLC, on cross examination, she indicated that there were so many Exit 20 properties that she got those confused. Neither GKH nor the trustee asked Ms. Gilbert about Exit 20 Partners, LLC.

One of the Companies listed with the A List Interests is CAM. With respect to the pledge of that interest in CAM, the operating agreement of that limited liability company provides that an interest may not be transferred without the prior written consent of the other members. *Operating Agreement of Cleveland Auto Mall, LLC,* Exhibit 6 at 10, Section 8.1(a)("Operating Agreement"). The Operating Agreement provides:

> (b) <u>Effect of Prohibited Transfer.</u>  Any transfer or acquisition of all or any portion of a Membership Interest in violation of Subsection (a) of this section shall be null and void and shall not operate to transfer any interest or title to the Membership Interest to the purported transferee. This restriction shall be effective against persons without actual knowledge of this restriction. The restrictions set forth in this article are deemed to be reasonable restrictions against the acquisition of a Membership Interest by persons whose interests may be inimical to that of the Company or other Members. Any transfer of a Membership Interest occurring as a result of the operation of law including without limitation, Section 48-218-101 of the Act shall not dissolve the Company, nor entitle or empower the transferee to become a Member, to exercise any governance rights, or to receive any notices from the Company, except as expressly required by the Act and this agreement.

*Operating Agreement* at 10, Section 8.1(b). "Act" is defined as the Tennessee Limited Liability Company Act as codified in Tenn. Code Ann. § 48-201-101, *et seq.,* and all amendments to it. *Operating Agreement,* at 1, Section1.1.

At the hearing, Mr. Nelson E. Bowers, II ("Mr. Bowers"), the only other member of CAM besides the debtor, identified a consent to the transfer of the interest as security to GKH that was effective "as of October 13 and October 24, 2008". *Consent of Nelson E. Bowers*, *II,* Exhibit 5. He was not able to recall when the consent was executed.

In addition to the Pledged Interests, the debtor also pledged to GKH three tracts of real property located in three different counties in Tennessee to secure the Demand Note on October 24, 2008. Exhibit 10, *Amended Proof of Claim of Grant Konvalinka & Harrison*, Parts 5, 6 and 7. [Claims Doc. No. 86-2]  At the continuation of the hearing on the Motion on May 24, 2011, the counsel for the trustee announced that the three tracts of real estate that were described in the Deeds of Trust attached to the Amended Claim were subject to prior secured claims of other creditors and the trustee had already agreed to lift the stay for those creditors. Therefore, he had no objection to lifting the stay for GKH based on his belief that GKH's motion was moot. Mr.

Konvalinka stated that he believed that the debtor may still own the real estate. The parties agreed that to the extent that the debtor still had an interest in the real property described in the Deeds of Trust, the trustee did not oppose stay relief and the real estate could be abandoned. The court will include that relief in the order accompanying this memorandum.

The debtor listed the claim of GKH as secured in the amount of $385,000 but listed no collateral. *Voluntary Petition*, *Schedule D* at 1, [Case no. 08-16987, Doc. No. 1] He failed to list any pledge of equity interests in his schedules or statement of affairs. GKH is not listed as party to an executory contract with the debtor despite GKH's commitment to provide up to $750,000 in legal services to the debtor and his companies. *Amended Pledge Agreement* at 1; *Schedule G*, [Doc. No. 53].

On April 27, 2009, Harry Cash, a member of GKH, filed a secured claim on behalf of GKH for $406,828.51.   Exhibit 9, *Proof of Claim of Grant, Konvalinka & Harrison* [Bankr. Case. No. 08-16378, Claim 86-1]("Claim"). Box 1 of the Claim states that the basis for the claim is "Services Performed." In box 5 of the Claim, GKH selected only "Real Estate" as its collateral. It described the collateral as "Promissory Note and Deeds of Trust for Properties Located in Hamilton, Bradley and Sevier Counties." *Id.* No other type of collateral was indicated on the face of the Claim. The date the debt was incurred was represented to be "10/24/2008" in Box 2. No documents were attached to the Claim.

On February 7, 2011, Richard Banks, as counsel for the debtor, filed an objection to the Claim alleging that the Claim should be disallowed because the amount was too great and there were no documents attached to support the amount due. *Objection  by Debtor to Proof of Claim* at 1, [Doc. No. 1003]; *Affidavit of Steve A. McKenzie in Support of Objection* at 1 [Doc. No. 1003].  GKH amended its claim on February 9, 2011. *Amended Proof of Claim*. Exhibit 10 [Bankr. Case. No. 08-16378, Claim 86-2]("Amended Claim"). The Amended Claim increased the amount owed to $750,000, reflected the basis of the claim as being a "Promissory Note," and reflected that GKH's collateral was real estate and "other." *Amended Claim* at 1. GKH attached copies of the Demand Note, the Pledge Agreement, the Amended Pledge Agreement, the Initial UCC, the UCC Amendment, the three deeds of trust to the Amended Claim and a list of the debtor's assets as of December 31, 2007. *Id.*  Parts 2- 10.  An objection was also filed to the Amended Claim by Mr. Banks on behalf of the debtor, but both objections were withdrawn prior to being heard. *Objection by Debtor to Amended Claim of GKH* [Doc. No. 1011]; *Notices of Withdrawal of Documents Nos.1003 and 1011*  [Doc. No. 1111 and 1112, respectively] The invoices for the services performed by GKH were not offered as exhibits to the Amended Claim nor as exhibits in support of the Motion at the hearing.

There was no evidence that a demand was made that triggered a default under the Demand Note and Pledge Agreement. Nevertheless, for purposes of this hearing, the court finds, based on the language of the stipulation, and, specifically, the use of the words "past due," that GKH is a creditor of the debtor, that value was given to support the grant of the security interest, and that a default has occurred that would have entitled GKH to exercise its remedies to the extent that the court finds that it has a security interest.[4]  [Doc. No. 1287, ("Opinion I"), pp.3 – 11].

---

[4]  To the extent that the nature of specific defaults may impact the legal analysis, GKH cited only the filing of a bankruptcy as the default in its reply to the Trustee's objection, and only then in the context that such a default triggered the loss of the debtor's governance rights. *Reply of GKH*, at 13. Neither party addressed whether 11 U.S.C. § 541(c)(1)(B) would operate to prevent the loss of whatever governing rights the debtor had on the date of filing.

## II.      Reserved Issues

### A.  Debtor's Rights to Transfer Pledged Interests

With respect to the debtor's rights in one of the Pledged Interests, CAM, the court previously found that GKH's security interest in CAM did not attach to the debtor's member interest. [Doc. No. 1287, Opinion I at 16]. GKH did not carry its burden to show that: (a) the debtor had rights in Pledged Interests that would allow him to convey the entire interest without the written consent of the other member of that limited liability company, and (b) consent from the other member had been obtained prior to the filing.  With respect to the other Pledged Interests, the court allowed GKH an opportunity to supplement the record with the other corporate documents to demonstrate that the debtor had the right to convey the Pledged Interests in the other entities named in the Pledge Agreement. The court also allowed the parties to address whether GKH's security interest attached to those interests which would be general intangibles despite restrictions in the corporate documents under Tenn. Code Ann. § 47-9-409. At the October Hearing, no other operating agreements were introduced by GKH to supplement the record. The court will address the issue of whether the debtor had rights in any of the Pledged Interests that could be conveyed regardless of the contents of the operating agreements or articles of organization.

### B.  Defensive Use of the Trustee's Powers to Defeat Motion for Relief

In addition to the issue of the transferability of the debtor's property interests, the court took under advisement the issue of whether the secured creditor must also demonstrate that its interest is superior to that of the trustee and is unavoidable in order to be granted relief. While it is generally the creditor's burden to demonstrate that its security interest is also validly perfected in order to show its interest is superior to the trustee's, the circumstances of this motion present

8

an issue of whether there is an exception to that rule.  The court must determine whether evidence of perfection is also a requirement when the period for avoiding a lien through an avoidance power has expired. The trustee contends that his status under 11 U.S.C. § 544(a) allows him to use that status defensively to defeat a motion for relief by an unperfected creditor. He further contends that his avoidance powers may also be used to defeat a creditor who obtained a perfected lien within the preference period. GKH contends that the trustee's status and the timing of perfection are irrelevant after the deadline for bringing an avoidance action has expired.

### C.  Equitable Tolling

The third issue that the court has under advisement is whether the trustee's deadline to avoid the security interest of GKH should be tolled because of the particular conduct of this creditor. The trustee argues that the facts in this case justify equitable tolling of the limitations period. GKH counters that this equitable relief is not available to the trustee because of his knowledge of GKH's interest long before the deadline to bring an avoidance action had run.

Having considered the entire record in the case including the evidence offered at the hearing and the arguments and briefs of counsel, the court now makes its findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure as made applicable to contested matters by Rule 9014(c). To the extent that capitalized terms are used without attribution, they have the same meaning given in the first memorandum issued on the Motion for Relief. [Doc. No. 1287, Opinion I]

### III.   Additional Findings of Fact

The court incorporates the findings of fact it made in Opinion I recited above unless amended or supplemented herein. Based on the evidence presented at the October Hearing, the court makes these additional findings of fact.

### A.   Pledged Interests and the Other Members' Consent

The list of Pledged Interests attached to the Amended Pledge Agreement lists forty entities. Exit 20 Partners, LLC is listed twice which brings the actual number down to thirty-nine. Of those thirty-nine entities, the debtor did not own East Tennessee Interstate Properties, LLC ("ETIP"); Tennessee Interstate Properties, Inc. owned 51% of ETIP, and there is no evidence that TIPCO pledged its interest in ETIP to GKH. Of the thirty-eight listed entities remaining, the court previously found that two of the named entities were not legal names and that the names listed in the Pledge Agreement were not sufficiently descriptive to identify the debtor's property. Opinion I at 17. Therefore, the security interests in those entities did not attach. Those were Spectrum Health, LLC and Exit 20, LLC.

Of the thirty-six Pledged Interests left, thirty-four are interests in limited liability companies ("LLC Interests"). One is a corporation and one is a partnership. With respect to the thirty-four LLC Interests, the court has already addressed the CAM interest, which is controlled by an operating agreement drafted by GKH that provides that an assignment of a membership interest is null and void without the consent of other members. The court previously ruled that GKH failed to show that such consent was given prior to the filing of the petition. Consequently, there was no valid attachment of its security interest in the member interest prepetition.

10

With respect to the other thirty-three limited liability company interests, seven are interests in limited liability companies wholly owned by the debtor according to the attachment to the Pledge Agreement. As to the other twenty-six limited liability companies ("26 LLCs"), the debtor is either a partial owner or there is no evidence before the court regarding the debtor's percentage of ownership. Two of the LLC interests are interests in Georgia limited liability companies. Exhibit 7, Certificate of Organization for SAM Galaxy Partners, LLC; Exhibit 8, Limited Liability Corporation Annual Registration for The Marina at South Bay, LLC.

With respect to consent by the other members of the 26 LLCs, Mr. Bowers testified that he had no opposition to the debtor's pledge of the Pledged Interests to GKH; however, Mr. Bowers did not identify which of the 26 LLCs were owned by only the two of them.  He also did not specify when his consent was first given.

There is some evidence in the record from other documents and witnesses regarding the extent of the debtor's ownership of certain entities.  The attachment to the Pledge Agreement contains an indication of the percentage ownership which the debtor held in the A List Interests although it does not show the name of any co-owners. Exhibit 1, Pledge Agreement. Ms. Marcia Gilbert, the CFO of SAM Management Company, testified that Mr. Bowers signed a guaranty for one of the entities which would imply that he had some ownership interest in that entity, but no supplemental proof was provided.

The corporation is TIPCO, a Tennessee corporation. The debtor owned shares in TIPCO individually. From documentation related to the Motion to Sell the Debtor's Interest in TIPCO and ETIP, the court has previously found that Mr. Bowers was the owner of the remaining stock in TIPCO, and that TIPCO owned 51% of ETIP. Order Granting in Part and Denying In

11

Part Debtor's Motion to Vacate Order Authorizing Sale, at 3 [Doc. No. 831] At the October

Hearing, the proof showed that Mr. John Anderson, a member and director of GKH, did have

possession of the debtor's TIPCO stock certificate, but there was no proof concerning when he

acquired the certificate. Scott LeRoy Testimony, October 24, 2011, 10:47 a.m.

The other entity is SAM Investment, GP, which the court assumes is a general

partnership by its designation "GP", although Ms. Gilbert testified at the May Hearing that the

entity was "owned by the debtor." There is no evidence in the record regarding who the other

partners are or whether there is a written partnership agreement.

B.   No Disclosure of Pledge of Interests in Schedules and Statement of Affairs

In Opinion I, the court noted that the debtor listed the claim of GKH as secured in the

amount of $385,000, but identified no collateral. Voluntary Petition, Schedule D. at 1. Opinion I

at 9.  At the October Hearing, Mr. Kyle Weems, the attorney who filed the voluntary case on the

debtor's behalf, testified that the debtor or the debtor's staff, including Ms. Gilbert, had provided

him with information regarding the pledge of the equity interests to GKH. Nevertheless, he failed

to list the transfer of the Pledged Interests to GKH. He did disclose the transfers of the real estate

in his response to Question 10 in the Statement of Financial Affairs, but even that information

was inaccurately disclosed -- the transferor and the transferee were reversed. Testimony of Kyle

Weems, October 24, 2011 at 10:13 – 10:14 a.m.; Exhibit 32, Statement of Financial Affairs;

Exhibit 3, Transfers in Response to Question 10, No. 3, [Doc. No. 59]; Exhibit 33, Docket No.

59-4, No. 4.

C.   Preparation of the Pledge Documents

The Pledge Agreement, the Amended Pledge Agreement, the Demand Note and the

Initial UCC Filing and the UCC Amendment will be referred to as the "Pledge Documents". At

the October Hearing, Mr. Anderson admitted that he was "probably" the party who prepared the documents.  John Anderson Testimony, October 24, 2011 at 3:15 p.m.  Three other directors of GKH testified at the October Hearing. They were Wayne Grant, Harry Cash and John Konvalinka, but of the three only Mr. Grant recalled anything about the creation of the security interest. Mr. Anderson testified, "I talked to Mr. Grant about the preparation of the documents and told him that we'd been approached by a client wanting to do that, and then asked him if he had a form for the pledge agreement, which I used for the form for the Pledge Agreement. I think that's where I got that. And that's why I think most likely I was the one that ultimately prepared the document."  Anderson Testimony, October 24, 2011 at 3:38 p.m. Mr. Anderson testified that the debtor had offered a pledge of these interests to secure his substantial debt for legal services owed to GKH without being asked to do so by anyone at GKH. *Id.* at 3:15 – 3:16 p.m.  Mr. Anderson offered no evidence that he discussed this transfer with Mr. Bowers or any other member of any of the entities to obtain their consent to the transfer. He did recall discussing the bankruptcy issues of taking the security interest with Mr. Cash. *Id.* at 3:14 p.m. He did not elaborate on what those bankruptcy issues were. Mr. Cash remembers only that he thought GKH had a lien on real estate.  Cash Testimony, October 24, 2011 at 2:44 – 2:45 p.m.

D.  Preparation of GKH's Proofs of Claim

In Opinion I, the court found that GKH did not disclose its security interest in the Pledged Interests in its Claim filed on April 27, 2009.  *Opinion I* at 9-10. The first time GKH disclosed in the record of this case that it did have a security interest in the Pledged Interests was February 9, 2011, when it filed the Amended Claim. That date was approximately two weeks after the trustee's deadline to file an avoidance action had expired on January 21, 2011.

At the October Hearing, Mr. Cash testified that he prepared the Claim without the aid of other lawyers. Cash Testimony, October 24, 2011, at 2:46 – 2:47 p.m.  He asked someone in GKH's billing office to tell him how much GKH was owed. *Id.* 2:48 p.m. He did not think he knew that GKH had been listed as a creditor in the debtor's chapter 11 case. *Id.* On the claim form, he listed the security interests in the real estate. He could not recall how he knew that the claim was secured by real estate, but he did recall that he was aware of only real estate as the collateral for the firm's claim. He listed the date of the Demand Note as the "Date the debt was incurred" in box 2 and checked "Services performed" as the basis for the claim in box 1. Exhibit 9, Claim.  He testified that he did not see the Pledge Documents until he prepared the Amended Claim.  Cash Testimony, October 24, 2011 at 2:44 – 2:49 p.m.  In the Claim, he inserted Mr. Anderson's name as the party to whom notices should be sent. *Id.* at 2:50 – 2:51 p.m. He testified that the first time he saw the Pledge Agreement and learned of the other collateral was when he met with Mr. Konvalinka to prepare an amended claim in response to the Objection filed by Richard Banks on February 7, 2011. Cash Testimony, October 24, 2011 at 2:49 p.m. It was at that time he first realized that the Claim was inaccurate. *Id.* at 2:48 – 2:49 p.m.  When asked about the increase in the amount reflected in the amended claim of $750,000, he indicated that the amount had come from Mr. Konvalinka. *Id.* The Amended Claim reflects that the basis for the claim is a promissory note dated October 24, 2008. Exhibit 10, Amended Claim. Mr. Anderson testified that the first time he recalled speaking to Mr. Konvalinka about the Pledge Documents was when the Amended Claim was being prepared. Anderson Testimony, October 24, 2011 at 3:37 – 3:38 p.m.

E.  Trustee's Knowledge of the Pledge Documents

At the October hearing, GKH provided evidence that Mr. LeRoy knew, or should have

known of the existence of the security interests evidenced by the Pledge Documents almost two

years before the filing of the Amended Claim. On March 17, 2009, Mimi Perelle, the debtor's

executive assistant at SAM Management Company, LLC, sent an email to Jack London, a

member of Henderson, Hutcherson & McCullough, PLLC, the accounting firm for the trustee,

with five attachments. Mr. London forwarded the email with the attachments to Mr. LeRoy on

the same day. Exhibit 14, Email from Mimi Perelle to Jack London dated March 17, 2009 with

attachments, forwarding email to Scott LeRoy at 1. ("London Email").  The first attachment was

a copy of the Amended Pledge Agreement dated October 29, 2008, signed by only the debtor and

notarized by Ms. Perelle. The GKH signature lines were blank. *Id.* at 2-6. The second attachment

is a deed of trust on three tracts of land dated October 27, 2008, signed by the debtor and

notarized by Ms. Perelle. *Id.* at 7-20. The third is the Demand Note dated October 24, 2008,

signed by the debtor. *Id.* at 21-24.The fourth is a copy of the Pledge Agreement dated October

13, 2008, signed by only the debtor and notarized by Ms. Perelle. Again, the GKH signature line

is blank. *Id.* at 25-31. The fifth document is a UCC1 financing statement showing GKH as the

secured party and the debtor as the debtor. The list of A List Interests is attached. *Id.* at 32-34.

There is no recording information reflected on the financing statement indicating that it had been

recorded or that the privilege tax had been paid.

Ms. Perelle testified that she sent the documents in response to a request by Mr. London

although she could not recall the specifics of the request. Mimi Perelle Testimony, October 24,

2011 at 2:03 – 2:04 p.m. She identified her email sent on March 17, 2009, which stated that the

security interest had been given "[i]n an effort to show good faith for payment and to maybe

protect some of our LLCs." Exhibit 14, London Email at 1. When counsel for the trustee asked

her to explain what she meant by that comment, she testified that the pledge was to show good

faith in paying their bill and to protect the assets of the LLCs from creditors.  "We were going to

assign them over to GKH." Perelle Testimony, October 24, 2011, at 2:05 – 2:08 p.m. She knew

this information by speaking to the debtor about the pledge transaction. *Id.*

      The file in which the debtor had kept copies of the Pledge Documents was also

introduced. Exhibit 19, 2004 Examination of Scott LeRoy, Exhibit 3 to the Examination. In

addition to the five documents attached to the London Email, the file contained a cover letter

from John Anderson on GKH letterhead dated October 13, 2008. The letter states:

> In accordance with our conversation on Friday, October 10, 2008, attached
> is the Pledge Agreement for the Membership Interest and/or Stock Interest in the
> various companies which you agree to pledge to us in payment of legal fees. As
> we discussed, for various reasons this document needs to be executed today so
> that we can have the Pledge Agreement in place and the security interest perfected
> as soon as possible.
>     Accordingly, I am requesting that you execute three (3) copies of this and
> return them to us today. Please have Mimi call me, and we will have a runner pick
> these up. I will return one fully executed copy to you.

*Id.* at Exhibit 3 at 3.  Prior to the filing of the case, the file had been maintained by Ms. Perelle.

Perelle Testimony, October 24, 2011, at 2:11 – 2:12 p.m. GKH, in the course of its discovery for

the October Hearing, located the original file in the debtor's documents. It was a part of the files

retained by the trustee during the case. These files were also reviewed by the accountant for the

trustee. John Konvalinka Testimony, October 24, 2011, 3:47 – 3:48 p.m. The file did not contain

a set of fully executed documents or recorded UCC financing statements. Exhibit 19, 2004

Examination of Scott LeRoy, Exhibit 3 to the Examination.

      Mr. LeRoy admitted that he had received the London Email forwarding the attachments.

There is one time entry on Mr. LeRoy's time records which mentions the Claim of GKH on the

day the London Email would have been received. Exhibit 20, LeRoy Time Records at 21. When

questioned about his knowledge of GKH's security interest, Mr. LeRoy testified that he had

discovered the transfers of the real estate while he was preparing the involuntary petition for his

client.[5] Scott LeRoy Testimony, October 24, 2011 at 11:33 – 11:34 p.m. The transfers to GKH

had been noted in the real property records. He recalled seeing many UCC financing statements

in the case. After receiving the London Email, he does not recall checking to see if the Initial

UCC Filing or the UCC Amendment had been filed. *Id.* at 11:30.  Despite having received the

attachments, signed by the debtor, granting a security interest in the A List Interests, Mr. LeRoy

appears to have remained under the impression that GKH held security interests in only real

estate until the Amended Claim was filed. He stated that he did review the GKH Claim, and

when the Amended Claim was filed, he compared it with the original proof of claim. *Id.* at 1:14

p.m.

    Other than the London Email with its attachments, the parties do not agree on whether

there were any other discussions about the security interest in the Pledged Interests prior to the

filing of the Amended Claim. The trustee testified that he was not aware of GKH's security

interest in the Pledged Interests until shortly after the Amended Claim was filed. C. Kenneth Still

Testimony, October 24, 2011 at 1:42 – 1:43 p.m. He had no recollection of a discussion with

Jack London or Scott LeRoy prior to that time about GKH's security interest in the Pledged

Interests. *Id.* at 1:45 – 1:46 p.m. He does recall a discussion with Harry Cash in March of 2009

asking about GKH's claim. *Id.* at 1:40 p.m. and 1:54 p.m. Mr. Cash identified an email dated

March 4, 2009, in which he reported to Mr. Anderson that the trustee had asked about "GKH

---

[5] Mr. LeRoy was originally retained by Community Trust & Banking Company, one of the creditors who filed the involuntary petition. After the involuntary proceeding was consolidated with the voluntary proceeding, he was retained as counsel for the creditors' committee and then as counsel for the trustee. [Doc. Nos. 1, 105, and 238.]

releasing its security interest." Exhibit 28, Email from Harry Cash to John Anderson.  Mr. Cash

believed that his use of the term *security interest* rather than *deed of trust* was because that was

the term that the trustee had used in the trustee's question.  Cash Testimony, October 24, 2011 at

2:56 p.m.  Mr. Cash did not recall any response having been given to the trustee's inquiry.  *Id*. at

2:41 p.m. Mr. Anderson remembers receiving the email but was not asked about whether he

responded to the email or forwarded it to Mr. Konvalinka. He did indicate that he would not have

had the unilateral authority to release the collateral. Anderson Testimony, October 24, 2011, at

3:21 p.m.

After the March inquiry by the trustee, on April 8, 2009, Mr. Anderson, Mr. Cash and

Mr. Grant, as members of GKH, met with the trustee and his professionals Mr. LeRoy and Mr.

London. Mr. Anderson recalls that he discussed GKH's security interest in personal property

specifically at the conclusion of that meeting. He testified that Mr. LeRoy "had specifically

requested that the firm release that interest in its security in the security agreement." John

Anderson Testimony, October 24, 2011, at 3:21 p.m.  He advised Mr. LeRoy in that meeting

"that if he wanted us to consider that that he would need to put it in writing and send it to me and

I would need to take it to Mr. Konvalinka for consideration." *Id*.

All the other attendees who testified about the April 2009 meeting recall that the primary

topics for discussion were what conflicts existed and whether GKH could represent other parties

on transactions in which it had previously represented the debtor individually or his businesses.

LeRoy Testimony, October 24,2011, at 10:34-10:35 a.m.; Still Testimony, October 24,2011, at

1:40-41 and 1:51 p.m.; Cash Testimony, October 24,2011, at 2:42-2:43 p.m.; and Grant

Testimony, October 24,2011, at 4:11 p.m. At the end of the meeting, Mr. LeRoy testified that he

raised the issue of the release of a deed of trust held by GKH. LeRoy Testimony, October 24,

18

2011 at 10:58 – 10:59 a.m. Exhibit 15, Notes of Scott LeRoy from April 8, 2009 Meeting. The

notes from the meeting are very short, but there is a notation "Deed of trust letter" without any

more detail.  Neither Mr. LeRoy nor the trustee recalls any discussion specifically of a security

interest in personal property.  LeRoy Testimony, October 24, 2011, at 10:35-39 a.m., Still

Testimony, October 24, 2011, at 1:41-42 p.m. Mr. Cash recalled a conversation about releasing a

lien on something. He thought GKH had a mortgage on real estate.  Cash Testimony, October 24,

2011, at 2:43-2:45 p.m. Mr. Grant remembered a discussion about a security interest that was a

lien pursuant to a deed of trust.  Grant Testimony, October 24, 2011, at 4:11-4:13 p.m. The court

concludes that the security interest of GKH in at least one of tract of real property was discussed.

The court does not find that there was a discussion of GKH's claim to the Pledged Interests in

April of 2009. To the extent that Mr. Anderson believes that he disclosed GKH's security

interest by using the term *security interest*, the court finds that reference to have been too subtle

to be a disclosure of GKH's claim to the Pledged Interests. The trustee and his counsel missed

the implications contained in his choice of words as did his fellow GKH director Mr. Cash who

filed the Claim nineteen days later on April 27, 2009, without any reference to the security

interests in personal property.

  In another interchange between the counsel for the trustee and Mr. Anderson, Mr. LeRoy

again addresses only a security interest in real property with Mr. Anderson. As a result of a real

estate transaction in which the estate was involved, Mr. LeRoy wrote in November of 2009 to

Mr. Anderson, "As you may recall we requested several months ago that GKH release the Deed

of Trust that was recorded to aid in the collection of attorney fees incurred by Mr. McKenzie

prior to the bankruptcy case." Exhibit 18, Email from Scott LeRoy to John Anderson; Exhibit 29,

Series of emails from 11/16/09 to 11/19/09 between Scott Leroy and John Anderson.  There was

no evidence that this letter prompted a response regarding GKH's willingness or refusal to release its deed of trust or any other lien which it now asserts. The emails reflect only that Mr. Anderson said he referred the decision to Mr. Konvalinka in November of 2009. *Id.* at 1.

On July 28, 2011, Mr. Farinash filed an adversary proceeding seeking to avoid the security interest in the Pledged Interests and objecting to the Amended Claim. [*Still v. Grant, Konvalinka & Harrison*, Adv. Pro. No. 11-01116

F.   Prior Hearings Related to the Pledged Interests

Prior to GKH's filing of the Amended Claim, the trustee was involved in several contested matters and adversary proceedings in which the Pledged Interests were also involved. Although GKH appeared in the proceedings on its own behalf or as counsel for one of the parties, it did not assert its security interest in the Pledged Interest that was the subject of the matter. The court will discuss GKH's and the trustee's participation and representations regarding the ownership and pledges of these interests to the court.

(1) *Cleveland Auto Mall, LLC*

The debtor listed a member interest in CAM in his Schedules valued at $1,926,106 filed with the court on January 26, 2009. [Doc. No. 51, Schedule B].  The debtor's interest in CAM is included in the attachment to the Pledge Agreement and the Amended Pledge Agreement. It is an A List Interest.

When the involuntary case was filed, CAM was the owner of a fifty- acre tract of real estate located near Exit 20 on Interstate 75 in Bradley County, Tennessee. The debtor as manager of CAM along with the co-owner Mr. Bowers executed a deed transferring the property from CAM to Exit 20 Auto Mall, LLC on December 10, 2008, after the involuntary proceeding was filed but before the voluntary proceeding was filed or the subsequent consolidation occurred. On

20

August 5, 2010, the trustee brought an action against Nelson E. Bowers II, Exit 20 Auto Mall, LLC, John Anderson, Grant, Konvalinka & Harrison, PC, and CapitalMark Bank & Trust. [Adv. No. 10-1407, ("50 Acre Complaint")]. The 50 Acre Complaint was signed by Mr. Banks and Mr. LeRoy as counsel for the trustee. *See* [Adv. No. 10-1407, Doc. No. 1]. Another complaint based on the same December 10, 2008 transaction was filed in Bradley County, Tennessee, alleging malpractice and breach of fiduciary duties. *Steve A. McKenzie and C. Kenneth Still v. Nelson Bowers II, et al*., Case No. 2010-CV-251, Bradley County Chancery Court. That case was also dismissed, but both dismissed actions have spawned additional litigation that is ongoing. The court has written several opinions regarding the litigation related to the December 10, 2008 transfer. [Doc. Nos. 1199, 1387, and 1388][Adv. Pro. No. 11-1016, Doc. No. 68]. During the two cases brought by the trustee, GKH did not disclose that it had a security interest in the member interest that was at the center of the controversy or that a recovery by the trustee might inure to only GKH's benefit.

At the October Hearing, the trustee argued that GKH had taken inconsistent positions about whether the CAM member interest was property of the estate, presumably in support of his request for equitable tolling. In the 50 Acre Complaint the trustee alleged that "All of the legal and equitable interests of McKenzie's numerous business interests became property of the bankruptcy estate in case # 08-16378." Exhibit 38, 50 Acre Complaint at ¶16. GKH responded that the "The remaining allegations of Paragraph 16 of the Complaint are denied as stated. To the extent the remaining allegations contained in Paragraph 16 of the Complaint seek a legal determination leading to a legal conclusion, such allegations are denied." Exhibit 38, Answer at 5, ¶ 16.. In paragraph 31, the trustee alleged that "McKenzie's share in Cleveland Auto Mall, LLC and that entity's sole asset of 60 acres of valuable land amounted to 'property of the Estate'

as described under 11 U.S.C. § 541." Exhibit 38, Complaint, ¶ 31. Again, GKH denied the

allegations and to the extent that the allegation sought a legal determination leading to a legal

conclusion, that allegation was also denied. Exhibit 38, Answer at 7, ¶ 31. Although the qualified

denial in the answer and GKH's current position are different, the determination of what was

property of the estate was a legal determination made by the court in the Order dismissing the 50

Acre Complaint. [Order Dismissing Adversary Proceeding, Doc. No. 67; Transcript of Oral

Opinion at 8-11, Doc. No. 71]. Since decision in the 50 Acre Complaint, GKH has consistently

taken the position that the member interest in CAM is property of the estate.

Although the two denials in the answer are not inequitable conduct related to the CAM

interest, the change in GKH's position asserting its lien in the CAM proceeds does raise concerns

about GKH's conduct in the case. Mr. Bowers testified at the October Hearing that GKH was

aware that the debtor had sold his interest in CAM on the day before CAM conveyed the fifty

acres to Exit 20 Auto Mall, LLC. Mr. Bowers testified that the debtor had approached him about

selling his interest in CAM for $125,000. Bowers Testimony, October 24, 2011, at 9:54 a.m. Mr.

Bowers ultimately decided on $75,000. *Id.* at 9:54-9:55 a.m. Mr. Bowers arranged for Steve

Dillard, who was the other member of Exit 20 Auto Mall, LLC, the purchaser of the fifty acres,

to purchase the debtor's membership interest for $75,000. Mr. Dillard wrote a check for $75,000

to the debtor's nominee[6] and delivered the check to the debtor.  Mr. Bowers testified about the

Buy-Sell Agreement between CAM and Exit 20 Auto Mall, LLC ("Buy-Sell Agreement"). The

---

[6]  The nominee was the debtor's daughter Shasta. Additional details regarding the debtor's conduct with respect to
this $75,000 are outlined in the trustee's complaint objecting to the debtor's discharge. *Still v. McKenzie*, Adv. Pro.
No. 10-1456, Complaint at 8-9 [Doc. No. 1]("Discharge Complaint"). According to the Discharge Complaint, the
trustee discovered the existence of the check on October 20, 2010. The check is attached to the Discharge Complaint
as Exhibit 2. On the reference line, it states "Cleveland Auto Mall." The Discharge Complaint allegations do not
contain any specific information regarding what was purchased with the $75,000. Based on the Testimony of Mr.
Bowers, what was purchased was the debtor's membership interest in CAM. The debtor waived his discharge in the
case and the Discharge Complaint has been dismissed.  Adv. Pro. 10-1456, Doc. No. 1, ¶ 34.

court has previously found that GKH drafted the documents for the transaction between CAM

and Exit 20 Auto Mall, LLC. Memorandum on Motion to Clarify at 3-4 [Doc. No. 1199]. He

testified that, before the date of the Buy-Sell Agreement, which was December 10, 2008, he had

informed GKH that the debtor was getting $75,000 for his interest.  Bowers Testimony, October

24, 2011 at 9:56-9:57 a.m. He did not testify about which member of GKH he informed of this

additional part of the transaction. He also testified that there were no discussions about GKH

receiving the $75,000 as proceeds of its security interest in the CAM member interest. *Id.* at 9:57

a.m.

 The trustee and GKH stipulated that there was no mention of the sale of the member

interest in the Buy-Sell Agreement. Mr. Konvalinka testified that he was not aware of the

additional $75,000 paid to the Debtor as part of the fifty acre transfer until he received an email

from Mr. Bowers' counsel. John Konvalinka Testimony, October 24, 2011 at 3:53 p.m.  Mr.

Konvalinka asserted that the proceeds of that sale were subject to GKH's security interest and

that he would pursue Mr. McKenzie for its recovery if the stay were lifted. Konvalinka

Testimony, October 24, 2011, at 3:53-54 p.m.  No other director of GKH was asked about

whether he knew about the $75,000 payment being part of the CAM to Exit 20 Auto Mall

transaction. The court finds that GKH was involved in the transfer of the acreage from CAM to

Exit 20 Auto Mall and was aware of the post petition sale of the debtor's interest, but

nevertheless it decided not to assert its security interest to the proceeds of the CAM interest at

that time of the transaction. The debtor obtained the funds for the sale of the property of the

estate, and there was no evidence presented whether those funds are still available for payment

on GKH's debt or for the benefit of this estate if GKH's security interest is avoidable.

(2) *Sale of ETIP and TIPCO Interests*

The debtor lists a note receivable from "East Tennessee Interstate Properties" in his

Schedules.  Schedule B, Exhibit at 2, Doc. No. 51-1. He also lists a 50% interest in "East

Tennessee Interstate Properties" in his response to Question 21 in the Statement of Financial

Affairs. Statement of Financial Affairs, Exhibit 4 at 1 [Doc. No. 59]. The debtor does not

mention TIPCO in his Schedules or Statement of Financial Affairs. The court has previously

found that ETIP's legal name is East Tennessee Interstate Properties, LLC. It is a Tennessee

limited liability company of which 51% is owned by TIPCO. [7.] The court has also held that the

debtor owned 1000 shares of TIPCO stock which represented a 50% interest in TIPCO. ETIP

owned 20 acres of real estate located at Exit 20, Interstate 75 in Bradley County, Tennessee.

ETIP is listed as one of the A List Interests in the Pledge Agreement. TIPCO is listed as one of

the B List Interests on the Amended Pledge Agreement.

In hearings related to the sale of the debtor's interest in TIPCO and ETIP, the court made

extensive findings about the debtor's interest in these entities. *See* Order and Memorandum

Granting in Part and Denying in Part, Debtor's Motion to Vacate Sale [Doc. No. 831].  It found

that Citizens National Bank ("Citizens") made a loan to ETIP guaranteed by the debtor, Mr.

Bowers and TIPCO. TIPCO also pledged its membership interest in ETIP as collateral. Out of an

abundance of caution, Citizens moved to lift the stay to allow it foreclose on the ETIP member

interest and any interest the debtor might have in TIPCO or ETIP. The trustee opposed the

motion, but after months of attempting to sell the real estate, the trustee, Mr. Bowers, and

---

[7] The names of the entities and their relationship to one another were a source of confusion at the hearing on the
debtor's Motion to Vacate Sale held on May 25, 2010. The court found that TIPCO was owned equally by the
debtor and Mr. Bowers. Its sole asset was a 51% ownership interest in ETIP. There was confusion at the hearings
when an affidavit supporting the debtor's motion used the name East Tennessee Properties rather than East
Tennessee Interstate Properties, LLC. To further confuse the situation, the court referred to Tennessee Interstate
Properties, Inc. inadvertently as Tennessee Investment Properties, Inc. in its memorandum and order. *Order
Vacating Sale In Part*, Doc. No. 831.

Citizens reached an agreement and sought authority to sell the debtor's interests in TIPCO and ETIP.

The Motion to Sell, filed on September 30, 2009, recited that "Pursuant to Rule 6004(g) of the Federal Rules of Bankruptcy Procedure it is believed that there are no liens against the estate [sic] equity interest." [Motion to Sell at 3, Doc. No. 530 ("Sale Motion")].  The Sale Motion was signed by John Anderson for GKH as counsel for Mr. Bowers in the transaction. *Id.* at 3. Mr. Anderson, the author of the Pledge Documents which listed "East Tennessee Properties" and TIPCO as two of the Pledged Interests, not only failed to disclose GKH's interest in the Sale Motion, but signed a pleading that represented that the liens did not exist. The court entered an order granting the authority for the sale. [Order Authorizing Sale, Doc. No. 550 entered November 9, 2009].

On April 2, 2010, the debtor filed a motion for the court to vacate the order authorizing the sale. [Motion to Vacate Sale, Doc. No. 612].  Among the debtor's contentions, he alleged that his interests had been sold for an inadequate price to an entity owned by Mr. Bowers in a transaction in which Mr. Bowers had been represented by GKH. At the hearing the debtor's attorney attempted to show that GKH and/or Mr. Anderson had a financial interest of their own in the transaction that was not disclosed to the trustee at the time the sale was approved. The court conducted a hearing on May 25, 2010, in which Mr. Konvalinka testified about GKH's ownership in TIPCO and ETIP. His testimony in that matter was offered as Exhibit 11 at the October Hearing. Mr. Banks, representing the debtor and not the trustee in this matter, engaged in the following questioning of Mr. Konvalinka:

Q:  Does the firm own any interest in Tennessee Interstate Properties Inc. or East Tennessee Properties, LLC?
A:  I'm not aware that it does.
Q: You don't know one way or the other?

A: I do know that we – I'm not aware that we have any ownership interest.

 Exhibit 11 at 7. Mr. Konvalinka was not asked if his firm owned a **security interest** in the

debtor's interests in TIPCO or ETIP; however, Mr. Konvalinka did not correct the allegation in

the Sale Motion signed by his fellow firm director Mr. Anderson that there were no other liens

on those interests.

The court did not vacate the sale order as to the sale of the TIPCO interest but did vacate

the sale of ETIP's interest on the basis that ETIP was not property of the debtor since it was

owned by TIPCO. [Order and Memorandum, Doc. No. 831]

The debtor then asked for a new trial. He attached his affidavit which alleged that the

evidence from lawsuits filed by the trustee would show that "John Anderson did at the time he

signed the order approving the sale of my interest in this property have a financial interest in that

property." Motion for New Trial, Affidavit of Steve A. "Toby" McKenzie, ¶ 7 [Doc. No. 834].

At the hearing on October 22, 2010, the court opened the hearing by reviewing its prior findings

regarding the mistakes that had been raised in the debtor's motion to vacate and in the motion for

a new trial. In determining that there had been no mistake about the trustee's knowledge of the

issues related to the value of the TIPCO interest, the court had found that the trustee had relied

on the fact that Mr. Anderson and GKH had no interest of their own in the real estate or the

equity interests that had been sold. The debtor contended that Mr. Anderson and/ or GKH did

have an interest, and that the court's finding to the contrary was a mistake.  The court

specifically noted that the debtor contended that the court made a mistake in finding that Mr.

Anderson and GKH were parties who acted "only as counsel [for Mr. Bowers] and did not have

any interest in the Exit 20 property, ETIP or TIPCO that might cause any representations that

they may have made to have affected the value."  Recording of Hearing, October 22, 2010

26

Hearing at 9:29-30 a.m. At the hearing, Mr. Banks questioned Mr. Anderson about his and

GKH's ownership in TIPCO and ETIP. Mr. Anderson testified that Mr. Konvalinka's Testimony

at the hearing on the motion to vacate was correct – that he currently had no ownership in TIPCO

or ETIP. Anderson Testimony, October 22, 2010, at 9:48-9:49 a.m. and 9:51 a.m.  He was not

asked specifically about a financial interest or a security interest in either entity by Mr. Banks.

No mention was made of the security interest in TIPCO or ETIP which GKH now asserts.

   At the recent October Hearing, Mr. Anderson was asked about whether he recalled that

TIPCO was one of the entities in which his firm claimed a security interest. His answer was "I

don't know that I did at the time."  Anderson Testimony, October 24, 2011, at 3:20. The

following exchange between the special counsel for the trustee and Mr. Anderson continued:

> Q: Did your firm say- did your firm have any objection to the sale of the estate's
> interest without payment to your firm?
> A: I don't know. I mean, I-
> Q: Wouldn't your firm be entitled to that money?
> A: Mr. Farinash, you pointed earlier I'm not a bankruptcy lawyer; don't know the
> answer to that question.
> Q: But you're a commercial lawyer, aren't you?
> A: I am.
> Q: You do UCCs all the time, don't you?
> A: Well, not as much as I used to. It's been not, not as frequent the last three or
> four years.
> Q: Well, when a – when someone has a security interest in something and monies
> generated from it, they get it, don't they?
> A: Not always, no.
> Q: Aren't they supposed to?
> A: Not always. It depends. Obviously there's a bankruptcy involved in here, and I
> don't know the answer to that.
> Q: Did you say anything to Mr. LeRoy or Mr. Still at that point in time about the
> Grant, Konvalinka & Harrison security interest in Tennessee Interstate Properties?
> A: I do not recall having discussed that with them.
> Q: Did you inform Village Investments, which is the buyer of that security
> interest, that your firm had an interest in Tennessee Interstate Properties?
> A: I don't know that our firm has an interest in Tennessee Interstate Properties. I
> don't know that it is a fair characterization to call a secured position an interest in
> ownership under what I, I understand the UCC law to be.

Q: Were there any discussions at your firm when this was going on about whether or not your firm was going to assert its security interest in Tennessee Interstate Properties?
A: Not to my knowledge.
Q: Are you familiar with the –
A: And let me say this, make sure I -- we're talking about the same thing. When you say security interest in Tennessee Interstate Properties, I assume what you mean is the security interest in the ownership in Tennessee Interstate Properties, right?
Q: Certainly.
A: Okay.
Q: Certainly.
A: Not to my knowledge.

*Id.* at 3:29 – 3:31p.m.

The court finds that Mr. Anderson is a director of GKH and an experienced commercial lawyer with extensive commercial experience generally, and with this debtor and his entities specifically. He knew or should have known that the allegation contained in the Sale Motion about liens against the debtor's interests in TIPCO and ETIP was inaccurate. The firm had two additional hearings at which to correct that inaccuracy, but did not.

(3) *Other Proceedings Involving Pledged Interests*

The trustee sought turnover of documents which he contended belonged to the debtor through an adversary proceeding against GKH. *Still v. Grant, Konvalinka & Harrison P.C,* Adv. Pro. No. 10-1397. The complaint attached a list of entities in which the trustee contended the debtor held all or a part of the equity. [Adv. Pro. No. 10-1397, Doc. No. 1, Exhibit A.] Of those entities, over a dozen of the entities named were also Pledged Interests. GKH did not raise its security interest in these Pledged Interests during this litigation regarding the documents involving these entities.  The turnover adversary proceeding was closed on November 19, 2010.

Village Lanes, LLC is listed as an A List Interest in the Pledge Documents. Exhibit 1, Pledge Agreement at.8.  This entity was owned by the debtor and a family trust whose

beneficiaries were his daughters. The entity operated bowling alleys. On August 13, 2009, Mr.

Banks filed a Chapter 11 proceeding for Village Lanes, LLC. [Bankr. Case No. 09-15086.] The

case was dismissed on August 30, 2010. [Bankr. Case no. 09-15086, Doc. No. 147]. GKH never

appeared in the case to assert its rights under the Pledge Agreement to oppose the filing of a

bankruptcy for Village Lanes. In March of 2011, GKH did oppose the bankruptcy filing of a

Chapter 7 for SAM Management Company, LLC. [Doc. No.1054]

SAM Management Company, LLC is listed as SAM Management LLC on the

attachments to the Pledge Agreement and the Amended Pledge Agreement. It is an entity that is

wholly owned by the debtor and was his principal operating company. The debtor's interest was

pledged to GKH in the Pledge Agreement. It is an A List Interest. The debtor filed several

motions in the case related to the administration of this company by the trustee. See [Doc. No.

414 (Real Property Sale Motion); Doc. No. 453 (Debtor's Reply); Doc. Nos. 621, 658, 684, 726

(Motion to Require Payment of Taxes and Responses); Doc. Nos. 1005, 1007, 1053 (Motion to

file Chapter 7 for SAM Management and Responses)]. GKH did not appear until the debtor

sought authority to put SAM Management Company into a Chapter 7 proceeding. [Doc. No.

1054 (GKH opposes filing and asserts security interest in SAM on March 3, 2011)].

## IV.    Jurisdiction

The court has subject matter jurisdiction over this bankruptcy case and this contested

matter. 28 U.S.C. §§1334 and 157(b)(1)(g). This case and all related proceedings have been

referred to this court for decision.

## V.    Analysis

A creditor may seek relief from the automatic stay for cause, including lack of adequate

protection. 11 U.S.C. § 362(d)(1). To prevail on a motion for relief from the automatic stay

based on lack of adequate protection for its interest, the creditor must first establish a *prima facie*

case by showing the following: (1) a debt owing from debtor to creditor, (2) a valid security

interest possessed by creditor; and (3) a decline in value of collateral securing debt, combined

with debtor's failure to provide adequate protection. Once the creditor makes such a showing, the

burden is on the debtor to prove that the creditor is adequately protected. *In re Cambridge*

*Woodbridge Apartments, L.L.C.*, 292 B.R. 832, 841 (Bankr. N.D. Ohio 2003). In any motion for

relief the creditor has the initial burden of showing good cause exists for relief from the stay. *In*

*re Stranahan Gear Co., Inc.,* 67 B.R. 834, 836 (Bankr. E.D. Pa. 1986)(a party seeking relief

under § 362(d)(1) must first establish a *prima facie* case for relief since relief can only be

afforded "for cause." (quotations omitted).  The movant also carries the burden on the issue of

the debtor's lack of equity in the property. 11 U.S.C. §362(g)(1). The parties have stipulated that

to the extent the court determines GKH has a valid security interest in any property of the debtor,

the debtor does not have any equity in such property. Exhibit 39, Stipulation at ¶ 2.

The court has previously found that GKH has a written security agreement that

sufficiently describes the Pledged Interests except for two interests. The court found that Exit 20,

LLC and Spectrum Health Operations, LLC were not sufficiently described so as to be

identifiable. The court must still determine whether GKH's security interest attached to the

debtor's interest in thirty six limited liability companies, one general partnership and one

corporation. Specifically, has GKH shown that the debtor had rights in those interests that he

could convey without the consent of the other members, or in the alternative, that he obtained the

necessary consent?

A.  Ability to Convey the Debtor's Interests

### 1.  TIPCO

With respect to the stock of TIPCO, the stock has been sold and the estate holds the

proceeds. The court has previously found that the member interest in ETIP was not property

owned by the debtor despite his representations in his Schedules to the contrary. He had no rights

in ETIP to convey to GKH. [Doc. No. 831, Order and Memorandum at 19-20].  With respect to

the stock in TIPCO, the security interest in the debtor's shares of TIPCO stock attached on

October 13, 2008. It is unclear whether the security interest was perfected prior to the filing of

the involuntary, but it was perfected prior to the stock's sale. The stock certificate was in the

possession of GKH. LeRoy Testimony, October 24, 2011,10:47 a.m.

### 2.  LLC Interests in Sole Member LLC's

With respect to entities where there is evidence that the debtor was the sole member, the

court finds that the debtor could convey his interest in those entities based on a review of the

Tennessee Limited Liability Act, Tenn. Code Ann. § 48-201-101 *et seq.* ("Tenn. LLC Act")*,* and

the Revised Limited Liability Act, Tenn. Code Ann. § 48-249-101 *et seq.* ("Revised Tenn. LLC

Act"). On the Pledged Interest List there are seven entities which are reflected as being owned

wholly by the debtor. There are six interests in Tennessee limited liability companies

(Chickamauga Shores Holdings, LLC; Hampton Creek Development, LLC; Hampton Creek Golf

Club, LLC; McKenzie Development, LLC; McKenzie Farm, LLC; and SAM Management

Company, LLC) and one interest in a Georgia limited liability company ( SAM Galaxy Partners,

LLC).  Even if there were any prohibitions against transfers in the operating agreements of those

entities, the debtor could waive those prohibitions. The Tenn. LLC Act provides that "[t]he sole

member of an LLC may freely assign governance rights and/or membership interests in the LLC

31

at any time." Tenn. Code Ann. § 48-232-102(a). The Revised Tenn. LLC Act also allows sole

members the right to freely assign. Tenn. Code Ann. § 48-249- 508(b)(2). With respect to SAM

Galaxy Partners, LLC, which is a Georgia limited liability company, Georgia law allows for the

assignability of a member interest unless otherwise provided in the operating agreement.

O.G.C.A. § 14-11-502(1) and (2). As the sole member, the debtor would have been the only

party who would have needed to consent even if consent were required in the Operating

Agreement. Georgia law also contains defines the impact of a pledge on the member's rights. *Id.*

at (7).  There is nothing prohibiting assignment or pledge in Georgia's Limited Liability

Company Act. The restrictions may be imposed but they are contractual provisions contained in

the articles of organization or a written operating agreement. As such they may be waived by the

sole member.

     In the Pledge Agreement, the debtor has represented that he has full power and authority

to enter into the Pledge Agreement. Exhibit 1, Pledge Agreement at 2, Para. 3(d). There is no

evidence to the contrary.  The debtor had rights which he could transfer. With respect to these

seven entities, GKH has an attached security interest in the debtor's interests in those entities.

However, as previously discussed in Opinion I, the security interests in these interests are not

perfected. All of these interests are A List Interests and were removed from the UCC records by

the UCC Amendment. The perfection issue is discussed in more detail in section V. B. 1. below.

### 3.   Undocumented Interests

     With respect to the remaining Pledged Interests that were sufficiently identified but for

which organizational documents have not been provided (the "Undocumented Interests"), the

court finds that GKH has not carried its burden with respect to showing that the debtor had rights

in the member interests which he could convey.

All of the Undocumented Interests, except one, are member interests in limited liability companies. Interests in limited liability companies have various components. Under the Tenn. LLC Act, a member interest means "a member's interest in an LLC consisting of a member's financial rights, a member's right to assign financial rights as provided in § 48-218-101, a member's governance rights, and a member's right to assign governance rights as provided in § 48-218-102…." Tenn. Code Ann. §48-202-101 (28).

Financial rights are defined as "a member's rights to: (A) Share in profits and losses as provided in § 48-220-101; (B) Share in distributions as provided in § 48-236-101; (C) Receive interim distributions as provided in § 48-236-102; and (D) receive liquidation distributions as provided in § 48-245-1101." Tenn. Code Ann. § 48-202-101(16)[8].

Governance rights are defined as "a right to vote on one (1) or more matters and all a member's rights as a member in the LLC other than financial rights and the right to assign financial rights." Tenn. Code Ann. § 48-202-101(19).[9]

The definitions are similar under the Tenn. Revised LLC Act. Tenn. Code Ann. § 48-249-101 *et seq.*

Both acts allow the members to impose restrictions on the assignment of the components of the member interest. Tenn. Code Ann. § 48-218-102, Tenn. Code Ann. § 48-249-508(e). While the two acts have many similarities, there are differences. To determine which act applies, the court needs the operating agreements which would specify pursuant to which act the company was formed. The CAM Operating Agreement provided that when Act was referred to it meant "the Tennessee Limited Liability Act, as codified in Tenn. Code Ann. § 48-201-101 *et*

---

[8] The definitional section was reenacted in 2010.  The definition is identical except that the subsection number is now (17). (Acts 2010, ch. 741  § 25)
[9] The definitional section was reenacted in 2010.  The definition is identical except that the subsection number is now (20). (Acts 2010, ch. 741  § 25)

33

*seq*." Exhibit 6, CAM Operating Agreement at 1, ¶1.1.  In light of GKH's failure to proffer the

operating agreements, the court will attempt to address both acts as they apply to the assignment

or pledge of a member interest.

> With respect to assignment, the Tenn. LLC Act provides that:

> (a) <u>Transfer of Membership Interests Restricted.</u> A member may assign the
>     member's full membership interest only by assigning all of the member's
>     governance rights coupled with an assignment to the same assignee of all the
>     member's financial rights.  A member's governance rights are assignable only
>     as provided in this section. A member or holder of a financial right has no
>     right to assign all or any part of the member's membership interest or
>     financial rights, except as provided in § 48-218-101 and this section.
> (b) <u>Consents Required</u>. Except as otherwise provided in the articles or the
>     operating agreement, a member may, without the consent of any other
>     member, assign governance rights to another member.

Tenn. Code Ann. § 48-218-102(a) and (b)(1).  The one operating agreement provided to the court

contained a restriction prohibiting assignment without consent. Exhibit 6, Operating Agreement

of CAM at 8.1(a)-(b). It required the consent to be "prior" and "written." *Id.* at 8.1(a).

The Revised Tenn. LLC Act uses the word *transfer* rather than *assign*, Tenn. Code Ann.

§ 48-249-508(a). *Transfer* includes a bill of sale, conveyance, security interest and transfer by

operation of law. Tenn. Code Ann. § 48-249-102(37). The consent to a transfer may be

evidenced by any manner provided in the agreement. If there is no method specified, "consent

shall be evidenced by a written instrument, dated and signed by such member." Tenn. Code Ann.

§ 48-249-508(b)(3). No written, dated and signed consent has been proffered except for CAM.

Exhibit 5, Consent of Nelson Bowers. Even that consent was not dated. *Id.*

> With respect to a pledge, the Tenn. LLC Act provides:

> Unless otherwise provided in the articles or an operating agreement, the pledge of,
> or granting of a security interest, lien or other encumbrance in or against, any or
> all of the membership interest of a member is not an assignment and shall not

> cause the member to cease to be a member or to cease to have the power to
> exercise any rights or powers of a member.

Tenn. Code Ann. § 48-218-102(e).  This language allows the articles or operating agreement to

provide for the transfer of the governance rights which would not be allowed otherwise.

> The Revised Tenn. LLC Act is similar.

> The pledge of, or granting of a security interest, lien or other encumbrance in or
> against, any or all of the membership interest of a member is not an assignment
> and shall not cause the member to cease to be a member or to cease to have the
> power to exercise any rights or powers of a member. The foreclosure of such a
> pledge, security interest lien or other encumbrance shall have the effect of the
> transfer of the financial rights derived from such membership interest and is
> subject to the provisions of § 48-249-507.

Tenn. Code Ann.§ 48-249-508(d).  The transfer of governance rights is addressed in subsections

(c) and (e) of the section.

> Both acts have a separate provision for the assignment or transfer of financial rights.

Tenn. Code Ann. § 48-218-101; Tenn. Code Ann. §48-249-507. Both acts allow the members to

restrict the ability to transfer financial rights in the operating agreement or articles. Tenn. Code

Ann. § 48-218-101(c); Tenn. Code Ann. § 48-249-507(c). Both acts provide that those

restrictions may be effective against transferees from the member if the operating agreements or

articles contain such restrictions. Tenn. Code Ann. § 48-218-101(c)(2)(restriction must not be

manifestly unreasonable);Tenn. Code Ann. § 48-249-507(c)(2).

> By failing to produce the Operating Agreements, GKH has failed to show that the

debtor's interest included the ability to transfer the debtor's member interest, and if so, under

what conditions. Without that information, the court cannot determine whether GKH's interest

attached.

> Under the acts, the court notes that there is an exception for effectiveness of the

restrictions on transfers. The restrictions may not be effective against a person without

knowledge of the restrictions if the restrictions are imposed by a written resolution adopted by all

the members, or by a written agreement among, or other written action by, all the members as

opposed to being contained in the articles or operating agreement. Tenn. Code Ann. § 48-218-

101(c)(2); Tenn. Code Ann. § 48-249-507(c)(1) and (2).  GKH put on no proof that it was

"without knowledge of the restrictions" when it took the security interests. To the extent that

GKH was the firm that drafted the operating agreements, and those operating agreements include

restrictions similar to those contained in the CAM Operating Agreement, GKH would have been

subject to the restrictions prohibiting a transfer of the member interest without prior written

consent. To the extent that GKH may have been involved in the creations of restrictions by

resolution, agreement or written action, it would have had knowledge.  The court finds that GKH

has not carried its burden to show that the debtor's member interests in the Undocumented

Interests were freely transferable under the applicable corporate law. Having failed to carry that

burden, GKH has not shown that it obtained an assignment of the debtor's member interests.

### 4.  SAM Investments, GP

With respect to SAM Investments GP, the one partnership interest, the court does not

have the partnership agreement or even know whether there was a written agreement creating

this interest.  Tennessee does not require a written partnership agreement. Tenn. Code Ann. § 61-

1-101(7). The partnership interest is personal property. The Pledge Agreement provides that all

of the debtor's interest is conveyed to GKH. Exhibit 1, Pledge Agreement at 1. A transfer of a

partnership interest is permissible. Tenn. Code Ann. § 61-1-503(a)(1). Restrictions may be

imposed in the partnership agreement, and they are effective against individuals with notice. *Id.*

at (f). As with the limited liability company interests, GKH has failed to show that the debtor had

unrestricted rights to transfer his interest, or that they had no notice of any restrictions on the

transfer.

### 5.    *Transferability under Tenn. Code Ann. § 47-9-408*

Even if the Pledged Interests are not transferable under the relevant corporate law, the

debtor may still have been able to convey the right to receive the proceeds from these interests in

a bankruptcy under Tenn. Code Ann. § 47-9-408. Limited liability member interests (unless

designated as securities by their operating agreements) and partnership interests are both

generally considered to be general intangibles. With respect to the CAM operating agreement

that was provided, it does not contain any provision opting for its membership interests to be

treated as securities under Article 8 of the Uniform Commercial Code. To the contrary, it

specifically states that the member interests will not be represented by certificates. Exhibit 6,

Operating Agreement at 5, ¶3.5.  The CAM interest is a general intangible.

As a general intangible, the limitations on the assignment of the CAM member interest

are ineffective. Tenn. Code Ann. § 47-9-408(c).  This section prevails over inconsistent

provisions contained in existing or future statutes such as the Tenn. LLC Act or the Revised

Tenn. LLC Act. *Id.* at (e). However, the interest attached through this section gives GKH much

more limited rights than those agreed to by the debtor in the Pledge Agreement. As assignment

under this section does not entitle the secured party to all of the rights of the original owner of

the interest. *Id.* at (d).  The assignment of the general intangible: (1) is not enforceable against

the account debtor; (2) does not impose a duty on the account debtor; (3) does not require the

account debtor to recognize the security interest, pay or render performance to the secured party,

or to accept payment or performance from the secured party; (4) does not entitle the secured

party to use or assign the debtor's rights under the general intangible; (5) does not entitle the

secured party to use, assign, possess, or have access to any trade secrets or confidential

information of the account debtor; and (6) does not entitle the secured party to enforce the

general intangible. *Id.*  The real value of an assignment under this section is only when there is a

distribution of proceeds to the interest holders, and in particular, when that distribution is made

in a bankruptcy proceeding. As long as the other elements for attachment have been met, the

security interest will attach even if the debtor's ability to assign the right is restricted by the

contract creating the interest. Tenn. Code Ann. § 47-9-408, Comment 7. In an example

describing an assignment of a franchise agreement that could not be assigned without a

municipality's consent, the commentators explained:

> If other law were given effect, the security interest in the franchise would not
> attach, and if the debtor were to enter bankruptcy and sell the business, the
> secured party would receive but a fraction of the business's value. Under this
> section, however, the security interest would attach to the franchise. As a result
> the security interest would attach to the proceeds while the bankruptcy is pending.

*Id.*  Although GKH has not shown that its assignment could overcome corporate restrictions on

assignment, under section 47-9-408, its interest has attached to the CAM member interest and the

other Pledged Interests to the extent that GKH has shown the interests are general intangibles,

such as the interest in SAM Investments, GP. The court cannot make this same finding with

respect to the Undocumented Interests without proof that those interests are not securities, and to

do that the court must have the operating agreements.

With respect to those Pledged Interests to which GKH's interest has attached[10], the court

must address the second issue which is whether those security interests must have been perfected

prepetition so that they would be superior to the interest of a hypothetical lien creditor in

existence on the date of filing. Alternatively, the court must determine, even if those interests

---

[10] The attached interests are the TIPCO stock, seven sole member interests, CAM, and SAM Investments, GP.

were perfected, whether the trustee's avoidance powers can be used defensively after the statute

of limitations has run to defeat a motion for relief.

> B.  Trustee's Ability to Use His Status as a Hypothetical Lien Creditor or His
>     Avoidance Powers Defensively.

The trustee opposes the lifting of the stay on the basis that GKH's security interest is

subordinate to the trustee's interest in the Pledged Interests. He contends that the security interest

must also have been perfected in order for the relief to be granted. He relies on *In re Ballard*, 100

B.R. 526 (Bankr. D. Nev. 1989). In that case, relief from the stay was denied because the creditor

had failed to perfect its interest prepetition. The *Ballard* court looked to the trustee's status as a

hypothetical lien creditor under section 544(a) and found that his interest was superior. Based on

that analysis, the court denied the motion for relief.

Tennessee law would lead this court to a similar conclusion. An unperfected security

interest is second in priority to the trustee's status as a judgment lien creditor pursuant to 11

U.S.C. § 544(a) and Tenn. Code .Ann. § 47-9-317. *Ford Motor Credit v. Ken Gardner Ford

Sales, Inc.,(In re Ken Gardner Ford Sales, Inc.),* 10 B.R. 632, 636 (Bankr. E.D. Tenn. 1981). To

the extent that a trustee can demonstrate that his status is superior on the date of filing to the

claim of any secured creditor in the case, that same section allows him to avoid that interest. 11

U.S.C. § 544(a). However, this case has an additional fact to consider due to the timing of the

trustee's use of this defense. The court will address the perfection and avoidability of

GKH'security interest and the impact of the statute of limitations on the defense.

### *1.Problems with Perfection of GKH's Security Interest*

In this case, of the eight attached Pledged Interests, there are only two that were perfected

on the date of the debtor's involuntary filing. They are the interests in TIPCO and SAM

Investments, GP,  -- both are B List Interests. All of the other interests are A List Interests. The

Amended UCC effectively removed the notice filing of the A List Interests and replaced, rather than added, the collateral described. As a result of that removal, at most, GKH has a perfected security interest in only the B List Interests that were sufficiently described and to which the security interest attached. GKH chose to list the member interests and stock interests by the name of the entity rather than using a generic category such as "all general intangibles." With respect to the A List Interests, a hypothetical judgment lien creditor would hold a superior interest to GKH in those interests and should be entitled to the proceeds from those assets before GKH.

GKH directed the court's attention to the case of *Jahn v. Cornerstone Community Bank (In re U.S. Insurance Group, LLC)*, No. 09-1079, 2009 WL 4723466 (Bankr. E.D. Tenn. Dec. 2, 2009). The court does not find the ruling in that case relevant to issue at hand. In that case, the issues raised by the repeated amendment of the financing statement by replacing the schedule of collateral was mooted by a later amendment which used the phrase "All accounts". GKH's Amended UCC describes the collateral as "all membership or stock interests *listed on Exhibit A*." Exhibit 3 at 2 (emphasis added).

With respect to the interests in TIPCO and SAM Investments, GP, GKH's security interest was perfected by the filing of the UCC Amendment and its security interest remained perfected on the date of the bankruptcy filing. The partnership interest is a general intangible that may be perfected by filing. Tenn. Code Ann. § 47-9-310(a). Even though perfection by control of GKH's security interest in the TIPCO stock might be in question since there was no proof of its delivery to GKH prior to the bankruptcy filing, its priority versus the trustee is not in question. A share of stock is a security. Tenn. Code Ann. § 47-8-103(a). A security is included within the definition of investment property. Tenn. Code Ann. § 47-9-102(a)(49). A security interest in investment property may be perfected by filing a financing statement. Tenn. Code

Ann. § 47-9-312(a). The UCC Amendment was filed prior to the filing of the involuntary bankruptcy. With respect to the security interests that GKH has shown were both attached and perfected, the court must address whether those security interests are avoidable.

### 2.   *Prima Facie Evidence of a Preference*

The Pledge Documents show that the security interests in the Pledged Interests were given to secure an existing debt to GKH. The dates on the Pledge Documents indicate that the transfer of the security interests took place within the 90 days of the filing of the involuntary case. From these facts it appears that the trustee has made a prima facie case that the security interests granted to GKH: (1) were transfers of the debtor's property; (2) to or for the benefit of a creditor; (3) on account of antecedent debt; (4) at a time when the debtor was presumptively insolvent; and (5) enabled the creditor to receive more than it would receive in a chapter 7. 11 U.S.C. § 547(a).

### 3. *Expiration of the Statute of Limitations to Avoid the Security Interests under Sections 544 and 547*

Section 544(a) gives a trustee the status of a hypothetical lien creditor as of the date of filing and provides him with avoidance powers to obtain the proceeds of the collateral for the benefit of the unsecured creditors generally. 11 U.S.C. § 544(a) and (b), Section 547 allows the trustee to avoid preferential transfers. 11 U.S.C. § 547(b).  To the extent that the lien may be avoided under section 506(d), the trustee may preserve that lien for the benefit of creditors. 11 U.S.C. § 551.  The Bankruptcy Code also imposes a limitation on the period of time during which a trustee may bring an adversary proceeding based on those powers. Section 546 of the Bankruptcy Code provides:

> An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—

(1) the later of—

(A) 2 years after the entry of the order for relief; or

(B)1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A);...

11 U.S.C. § 546(a)(1).

In this case, the statute of limitations period set forth in section 546 expired on January 21, 2011, two years after the court entered the order for relief on January 21, 2009. [Doc. No. 39]. GKH contends that perfection is no longer relevant since the trustee can no longer bring an action to avoid the lien under either section 544 or 547. GKH argues if there is no way for a trustee to avoid a lien, then his status as a hypothetical judgment creditor is meaningless. In order for the trustee to use his status to overcome a motion for relief, he must still be within the statute. *In re Ballard*, 100 B.R. 526, 527 n.1 ("[Creditor] and the trustee directly addressed the issues of [Creditor's] status as a perfected lien holder in their respective points and authorities. While no complaint has yet been filed by the trustee under 11 USC §544, the trustee is well within the statute of limitations of 546. Accordingly, this court will consider whether or not [Creditor's] interest is subject to being defeated by the trustee in deciding this motion." (citing *In re Swati, Inc.*, 54 B.R. 498 (Bankr. N.D.Ill. 1985)).

The question before the court is whether the trustee may still oppose a motion for relief based on the avoidability of the security interest if the period for bringing an avoidance action has expired. The trustee contends that so long as he is using his lien creditor status or his avoidance power defensively there is no time limitation. Alternatively, the limitation period should be equitably tolled under the circumstances of this case.

Taking the defensive use first, the trustee contends that he may use his status defensively to ensure an equitable distribution to all creditors. He cites *In re American Pie, Inc.,* 361 B.R. 318 (Bankr. D. Mass. 2007) as an example of the use of this status after the two year period has run to overcome a counterclaim made by creditors seeking a ruling that they held claims secured by property of the estate. *Id.* at 319. In that case, the creditors' financing statement which perfected their interest lapsed before the petition date. *Id*. at 320. In the adversary proceeding, the trustee also asserted that he was entitled to equitably subordinate the claims of the creditors. When the statute of limitations was raised to defeat the trustee's argument, the trustee contended that he was not avoiding a lien. Rather, he was objecting to the claim of the lien and section 502(d) was not subject to the limitation period of section 546(a). *Id*. at 321. The court allowed the trustee to use his avoiding powers to defeat the claims.

There are two opposing lines of authorities which address whether the trustee's status as a judgment lien creditor or his avoiding powers may be used "defensively" to support an objection to a creditor's proof of claim. An often cited case in the line finding that the trustee may raise his avoidance powers defensively after the statute of limitation has run is *In the Matter of Mid Atlantic Fund*, *Inc.*, 60 B.R. 604 (Bankr. S.D.N.Y 1986). In that case, the creditors asserted a secured claim in a note and mortgage and in the proceeds paid to the trustee postpetition.  After the trustee's deadline to file an adversary proceeding avoiding their lien had run, the creditors demanded turnover of the note, mortgage, and proceeds.[11] When the trustee did not respond, the creditors filed the motion for turnover. The trustee asserted preference and priority under 11 U.S.C. § 544(a)(2) as defenses to the secured creditor's "reclamation" request. *Id.* at 606.  He

---

[11]   The court noted that the creditors' delay was a calculated maneuver. *Id.* at 607 n.4.

relied on section 502(d) despite the fact that the defense was raised after the time limit imposed

by section 546. *Id.* at 602.

Section 502(d) provides that

Notwithstanding subsections (a) and (b) of this section, the court shall
disallow any claim of any entity from which property is recoverable under section
542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable
under section 533(f), 522(h), 544, 545, 547, 548, 549, or 742(a) of this title,
unless such entity or transferee has paid the amount, or turned over any such
property, for which such entity or transferee is liable under section 522(i), 542,
543, 550, or 553 of this title.

11 U.S.C. §502(d).

The court in *Mid Atlantic Fund* found that "[i]n passing on the Creditors' reclamation

motion, the court must necessarily consider the Creditors' rights to the Fredebaugh Mortgage.

That requires the court to determine whether the creditors' claim can be allowed as a secured

claim to the extent of the Fredebaugh Mortgage." *Id.* at 608-609 (footnotes and citation omitted).

The court then addressed the impact of the expiration of the statute of limitations on the trustee's

defense. Noting that the rule under the Bankruptcy Act allowed the defensive use after expiration

of the limitations period, the court found that there was no reason that the rule should be different

under the Bankruptcy Code. *Id.* at 610. The court commented that its ruling would not allow the

trustee to recover payments made to the creditors since the statute had run, but liens could be

avoided. *Id.* at 611 n.12.  It explained that when 502(d) is used to disallow the claim of a secured

creditor, the lien becomes void.

To the extent that a lien secures a claim against the debtor that is not an allowed
secured claim, such a lien is void unless (1) a party in interest has not requested
that the court determine and allow or disallow such a claim under section 502 of
this title or (2) such a claim was disallowed only under section 502(e).

*Id.* at 611. The trustee in this case has requested that the court determine whether the claim

should be allowed. *Still v. Grant, Konvalinka & Harrison, P.C.,* Case no. 11-0116, Doc. No. 1,

Complaint at 11-13. Except for the motion seeking *turnover* of its collateral rather than *relief*

*from the stay*, the court finds that the facts of *Mid Atlantic Fund* are very similar to the facts in

the case before the court.

The majority of courts follows *Mid Atlantic Fund* and permits such defensive use of the

trustee's status.

> The court in *In re McLean Indus. Inc.* observed that the majority of courts has
> permitted the defensive use of 502(d),. . . In *Cushman Bakery*, the United States
> Court of Appeals for the First Circuit, interpreting § 57(g) of the former
> Bankruptcy Act, emphasized that the goal of equality of distribution was
> disturbed by an illicit preference. It, therefore, permitted the trustee to assert
> receipt of a preference defensively after the expiration [of][sic] the limitation
> period.

*In re American Pie,* 361 B.R. at 323. (citing *In re McLean Indus. Inc.,* 196 B.R. 670, 676
(S.D.N.Y. 1996); *In re KF Dairies, Inc.* 143 B.R. 734, 736 (9th Cir. BAP 1992); *In re Stoecker*,
143 B.R. 118, 131(Bankr.N.D. Ill.), *aff'd,* 143 B.R. 879 (N.D. Ill. 1992); *In re Chase & Sanborn
Corp.* 124 B.R. 368, 370 (Bankr. S.D. Fla.1991); *In re Minichello.* 120 B.R. 17, 19 Bankr. M.D.
Pa. 1990), *See also In re American West Airlines, Inc.* 217 F.3d 1161(9th Cir. 2000); *In re
Cushman Bakery*, 526 F.2d. 23(1st Cir. 1975), *cert. denied* 425 U.S. 937, 96 S.Ct. 1670, 48
L.Ed.2d178 (1976)).

The claim objection analysis has been extended to cut off a turnover claim for proceeds

from the sale of estate property. In *In re Loewen Group International, Inc.,* 292 B.R. 522 (Bankr.

D. Del. 2003), the court found that the sale proceeds at issue were subject to a resulting trust, but

that the unrecorded equitable interest was subordinate to the trustee's status as bona fide

purchaser. *Id.* at 527. The court found that the recovery action was "essentially an attempt to

recover on a claim asserted against the [debtor's] estate.  In that context, [the debtor] is using §

544(a)(3) defensively and § 546(a) is not applicable." *Id.* at 528.

In another case addressing the defensive use of the trustee's avoidance powers, the

Bankruptcy Court for the Southern District of New York found that a trustee could object to a

claim on the basis that the lien was avoidable, even though the trustee's time period had expired

under section 546. In that case, the court found that evidence of an avoidable transfer could be

used defensively in an objection to claim while evidence of an avoidable obligation could not be

used defensively. *In re Asia Global Crossing*, *Ltd.,* 344 B.R. 247, 255. (Bankr. S.D.2006) The

court reviewed the cases and the contexts in which the disallowance of a claim under section

502(d) of the Bankruptcy Code was used defensively and the rationale for each. *Id.* at 254-256.

In summarizing its analysis, the court stated:

> *Loewen's* explicit approach supplies the clearest rationale for the results in
> these cases. Any time a third party seeks to recover property of the estate, whether
> through a proof of claim, a turnover proceeding or the assertion of a superior
> interest in estate property, the third party is asserting a "claim" within the
> meaning of section 502(a). In those instances, the trustee can assert the estate's
> rights under §502(d). This construction is consistent with the overarching
> principle of equality of distribution, and the specific purpose of § 502(d).
>
> Furthermore the cases involving the trustee's reliance on his strong arm
> powers under § 544(a) can be explained without regard to § 502(d). Section
> 544(a)(3) gives the trustee a status as well as an avoiding power. He is deemed to
> have the rights and powers of a *bona fide* purchaser, which he retains throughout
> the case and without regard to § 546(a)(1).

*Id.* at 255-56.

The opposing line of cases requires the trustee to obtain a judgment under the applicable

avoidance statute before raising a section 502(d) defense. COLLIER ON BANKRUPTCY, ¶

546.02[1][d](16th ed.).  GKH relies on *In the Marketing Associates of America, Inc.,* 122 B.R.

367 (Bankr. E.D. Mo. 1991). In that case, the court addressed whether a court may disallow a

claim upon the trustee's prima facie showing that the creditor received an otherwise avoidable

preference although the trustee is time-barred from bringing an adversary proceeding under

Section 547 of the Code. *Id.* at 368.  The court declined to follow the *Mid Atlantic Fund* line of

cases and found that "it is implicit that no preference is avoidable if the action is not brought

within the time limits prescribed by Section 546(a)(1)". *Id* at 369. The court found the use of

"such a procedural windfall unjust." *Id.* at 370.  For other cases taking the minority position, *see*

*Holloway v. Internal Revenue Service, (In re Odom Antennas, Inc.)*, 340 F.3d 705, 708 (8th Cir.

2003); *Hoggarth v. Kaler (In re Midwest Agri Development Corp.),* 387 B.R. 580, 586 (B.A.P.

8th Cir. 2008).

The Bankruptcy Appellate Panel for the 9th Circuit reviewed the *Marketing Associates*

case and determined that its criticism of *Mid Atlantic Fund* was "misplaced." It added the further

rationale that 502(d) could be used even where the statute of limitations had run:

> Moreover the allowance or disallowance of a claim has the same impact
> on the equality of distribution to creditors regardless of whether the underlying
> avoidance action is time-barred. A creditor in receipt of an avoidable transfer
> obtains full payment on that portion of its claim. Allowance of its claim provides
> a partial distribution on account of other unpaid debts. Taken together, the
> avoidable payment and the bankruptcy distribution allow such a creditor to
> recover a greater portion of its original aggregate claim than other creditors, and
> at their expense. Because there can be no affirmative recovery by the estate, the
> disallowance of a claim under section 502(d) ameliorates, but may not eliminate,
> the advantage obtained by the avoidable transfer.
>
> We can discern no purpose for section 502(d) if it applied only when the
> transfer therein contemplated could form the basis of an independent avoidance
> action seeking affirmative relief from the transferee. An avoidance action would
> support an objection to claim based on recoupment or set-off without resort to
> section 502(d). The claim objection would assert that the estate's obligation on
> the claim should be reduced by the claimant's obligation under the judgment. A
> determination on the claim would be held in abeyance pending judgment in the
> avoidance action.
>
> Because the bankruptcy code is concerned chiefly with equality of
> distribution, *see Begier v. I.R.S.*, 496 U.S. 53, 58, 110 S.Ct 2258, 2262, 110 L.Ed.
> 2d 46 (1990), it does not sanction a choice between the equal distribution an
> action would provide and the less unequal distribution an objection would
> provide. When both are available to remedy an avoidable transfer, an action
> yielding affirmative relief should be pursued. If an action is time-barred, an
> objection yielding partial relief should be pursued. In this manner, the Code
> achieves the most equal distribution available and remains consistent with ancient
> common law doctrine concerning the defensive use of time-barred claims.

*Committee of Unsecured Creditors v. National Dairy Promotional and Research Board (In re KF Dairies)*, 143 B.R. 734, 737 (B.A.P. 9th 1992).

Based on the foregoing analysis, the court finds that the trustee has the status of a hypothetical judgment lien creditor. His interest is superior to the Pledged Interests to which GKH's security interest attached and that are A List Interests. With respect to the security interest in the B List Interests including TIPCO and SAM Investments, GP, the trustee has made a prima facie case that the granting of the security interest in those Pledged Interests was a preferential transfer to GKH. The trustee may use his status and his avoidance powers defensively to prevent a distribution to GKH on account of an otherwise avoidable transfer. If the stay were lifted, the relief requested would effectively result in a distribution to GKH of the Pledged Interests and a claim to the proceeds from the sale of the TIPCO stock now held by the trustee.

C.  Equitable Tolling

Even if the minority position of *Marketing Associates* were adopted, the trustee contends that his time to avoid the lien should be tolled and the motion denied until his adversary proceeding is resolved.  Equitable tolling is the trustee's final defense to GKH's contention that the trustee is prohibited from raising perfection or preference as a defense to the motion for relief.

"Strictly defined, equitable tolling is [t]he doctrine that the statute of limitations will not bar a claim if the plaintiff, despite diligent efforts, did not discover the injury until after the limitations period had expired." . . . "Typically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control ... [but a]bsent compelling equitable considerations, a court should not extend limitations by even a single day.". . . "When determining whether to apply the doctrine of equitable tolling, courts consider the following factors: "(1) lack of actual notice of filing requirement; (2) lack of constructive knowledge of filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the

48

defendant; and (5) a plaintiff's reasonableness in remaining ignorant of the notice
requirement." Nevertheless, "[t]he propriety of equitable tolling must necessarily
be determined on a case-by-case basis."

*Newton v. Wells Fargo Financial, Inc. (In re Dill),* No. 07-3125, 2008 WL 235723 at \*3 (Bankr.
E.D. Tenn. 2008)(quoting *Tapia–Martinez v. Gonzales,* 482 F.3d 417, 422 (6th Cir.2007);
*Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.,* 209 F.3d 552, 561 (6th Cir.2000);
*Nardei v. Maughan (In re Maughan),* 340 F.3d 337, 344 (6th Cir.2003)).

The considerations which must be balanced in this case to determine whether to apply

equitable tolling are not easily weighed. If the court looks only to the factors for the application

of equitable tolling, the trustee cannot meet his burden.[12]  The trustee, an experienced bankruptcy

professional, knew that that he had two years to bring an avoidance action. His counsel and his

accountant were aware that the debtor signed pledge agreements conveying a number of his

equity interests to GKH.  Both have extensive experience in bankruptcy matters.  The financing

statements evidencing the security interests were of record in the office of the Tennessee

Secretary of State. The trustee and his professionals were specifically aware that one or more

deeds of trust in favor of GKH had been filed shortly before the involuntary was filed. He and

his attorney were also aware that GKH was not responding to inquiries about its claim or the

release of the deed of trust. If GKH had never responded when questioned or had failed to file

any claim at all, even though required by local rules to do so, its silence would not be enough to

justify equitable tolling. *In re Dill,* 2008 WL 2357237, at \* 4-5.

---

[12] The one factor that the trustee might have been able to meet is damage to the defendant. The one member
interest that has taken up so much of the court's time – the interest of CAM- appears to have been sold for $75,000
in the first few weeks of the case without opposition by GKH. The TIPCO interest was sold without GKH
opposition pursuant to an order of this court in which GKH represented the buyer. The $2500 of proceeds remains in
the trustee's account. There was no other proof provided about damages which may be sustained if the trustee
retains these interests and equitable tolling is applied. The court acknowledges that the continued stay while the
issues are litigated will prevent GKH from foreclosing on its security interest. Its right to monetize those interests
may be limited by Tenn. Code Ann. § 47-9-408(d). The parties stipulated the value of the entities is less than the
amount of the past due fees owed to GKH. The Motion for Relief estimated the value of the interests to be $100,000.

However, there is more to be weighed in this case than a failure to conduct due diligence on the part of the trustee against a failure to respond on the part of GKH. GKH made affirmative representations in the record which contradict its current position that it has a security interest in the Pledged Interests. Where there are compelling equitable considerations, the Sixth Circuit finds an exception to the rule, and the court may allow equitable tolling. In those situations, the court may consider the propriety of equitable tolling on a case by case basis.

The trustee argues that compelling equitable considerations exist. Mr. LeRoy testified that the early days of this case were "chaotic" and "hectic." LeRoy Testimony, October 24, 2011 at 10:26 a.m. The court will take judicial notice that the schedules reflect that the debtor owned many interests and ran multiple businesses from real estate developments to bowling alleys. In the midst of this workload, the court finds that Mr. LeRoy failed to appreciate and to act on the London Email. He mistakenly concluded that GKH's collateral was only real estate. However, the court also finds that the debtor, the debtor's professionals, and GKH reinforced that mistaken belief. One of the main sources for a trustee to analyze preferential transfers is the debtor's Schedules and Statement of Financial Affairs. In this case, they were inaccurate. The transfer of the debtor's member interests was not listed on the debtor's schedules despite the debtor's very experienced legal counsel being aware of the granting of the security interest. Kyle Weems Testimony, October 24, 2011at 10:02-10:03 and 10:35- 10:15 a.m.

The trustee and his counsel contend that they diligently pursued the interests in this case, but were diverted or misled by GKH. As evidence of their diligence, the trustee and his counsel met with three members of GKH approximately a month after the London Email was sent to discuss GKH's representation of parties other than the debtor in the case going forward. The parties have differing recollections of what was discussed at the meeting in April when the issue

of GKH's claim and security interest was raised. Even the three members of GKH do not agree about what was discussed. Mr. Anderson is the only person who clearly recalls that he discussed the security interest **and** the deed of trust, but even he seems to have forgotten the existence of the security interests when he signed the Motion to Sell the TIPCO interests approximately seven months later.

Shortly after the April 2009 meeting, Mr. Cash, who was present at the meeting at which Mr. Anderson claims he discussed the security agreement and deed of trust, signed and filed the Claim on behalf of GKH. Completing the official form, he describes the collateral in box 5 as "Promissory Note and Deeds of Trust for Properties Located in Hamilton, Bradley and Sevier Counties." No supporting documents were attached as requested in No.8 in the form. There is no explanation why the documents are not available. There is no contention that the documents were too voluminous to attach. Mr. Cash testified that he did not see the Pledge Documents at this time, but the court notes that he was aware that the "date debt was incurred" was October 24, 2008, the date of the Demand Note, not the date the legal services were first provided. Despite the fact that fully executed and recorded Pledge Documents were in the possession of GKH at the time Mr. Cash filed the GKH Claim, they were not attached to nor referenced in the Claim. The Claim remained without any indication that there was a security interest in any personal property until after the expiration of the statute of limitations.

The Claim is not the only instance in which GKH made a representation contrary to its current position. In the TIPCO sale in April of 2010, Mr. Anderson was involved in preparing the original Sale Motion on behalf of Mr. Bowers and signed the Sale Motion alleging that there were no other liens on those interests. Counsel for the debtor alleged that Mr. Anderson or GKH had an ownership interest in these entities. Mr. Konvalinka, who made a limited appearance on

behalf of Mr. Bowers, testified at the May 2010 hearing about TIPCO and ETIP's corporate

status.  When asked about whether his firm owned any interest in the two entities, Mr.

Konvalinka responded that he was not aware that it did. Exhibit 11, John Konvalinka Testimony,

May 25, 2011, Hearing at 7. A determination of whether this response was misleading or merely

careful depends on whether the listener focuses on the words *any interest* or the word *own*.

However the response is interpreted, the testimony did not leave the court with the impression

that GKH itself had any interest in the transaction before the court.

The debtor, refusing to give up on his allegations regarding GKH's or Mr. Anderson's

financial interest in the real property or the entities being sold, filed a motion to reconsider the

court's order in which he alleged that "John Anderson did, at the time he signed the order

approving the sale of my interest in this property, have a financial interest in that property."

[Affidavit of Steve A. McKenzie, in support of motion to reconsider.Doc. No. 834-1,¶7].  The

court held a hearing on October 22, 2010, on the motion to reconsider its order on the motion to

vacate. One of the issues at that hearing was whether GKH or John Anderson had an ownership

interest in TIPCO or ETIP or in the acreage owned by ETIP. Mr. Anderson testified that neither

he nor his firm currently had an **ownership** interest in TIPCO or ETIP. Contrary to his

Testimony at the October Hearing, Mr. Anderson did not seek a clarification of the question

about ownership to insure that his answer was accurate.

On February 7, 2011, approximately three weeks after the two year period ran, Mr.

Banks, as counsel for the debtor, filed an objection to the GKH Claim for failure to file

documents and disputing the amount owed. The objection was supported by an affidavit by the

debtor.[ Doc. No. 1003]. In response to the objection, GKH filed the Amended Claim on

February 9, 2011, for $750,000 and attached the Pledge Documents. [Doc. No. 1006.]  Despite

the numerous hearings in the case involving the Pledged Interests, the Claim was not amended until there was an objection brought by the debtor.

The Amended Claim still has no detail of the services provided or whether those services were performed for the debtor or one of his companies. It reflects the amount owed as $750,000 although the parties stipulated for purposes of the October Hearing that the debt was only $486,828.51. Exhibit 39, Stipulation, ¶ 1. Mr. Cash testified that the number he inserted in the Amended Claim came from Mr. Konvalinka rather than GKH's business office.

At the October Hearing, the trustee also questioned the members of GKH about their failure to assert their liens at other times in the case. The trustee specifically questioned the GKH members about the sale of the assets of SAM Management, the answer of GKH in adversary proceeding no.10-1407 involving CAM, and the answer to the complaint to obtain turnover of documents from GKH's records. GKH responded that there was nothing in those matters that required a disclosure of the security interest. The court agrees with GKH that, taken individually, nothing in those specific matters required an affirmative disclosure of GKH's security interest. However, those matters provided opportunities to correct the affirmative representations that had been made. For that reason the court has considered GKH's failure to raise its security interest until after the statute of limitations had run in its evaluation of whether compelling equitable considerations exist.

The court finds that GKH's conduct related to the assertion of its security interest in this case rises to the level of a compelling equitable consideration that would allow the court to apply the doctrine of equitable tolling. Therefore, the possibility of the trustee avoiding the security interest remains, and the motion for relief will be denied.

## VI.    Conclusion

GKH has failed to prove that its security interest attached to all but ten of the Pledged Interests. With respect to those ten interests, the court concludes that perfection is still relevant to the court's consideration of the motion for relief. The trustee's status as a hypothetical lien creditor is superior to the unperfected security interest of GKH in the A List Interests, and the trustee may use that status defensively to prevent the removal of those interests from the estate even though the statute of limitations for avoidance has expired. With respect to the two B List Interests, the trustee has made a prima facie case that the security interest in those interests was a preferential transfer, and his avoidance power may be used defensively to prevent a distribution from the estate. In the alternative, the trustee has demonstrated that compelling equitable considerations exist in this case such that the statute of limitations for avoidance actions should be tolled. As such, it appears that the security interest of GKH may still be avoided as a preference. It appearing that GKH has failed to show that it has a validly perfected and unavoidable lien in the Pledged Interests, the court finds the motion for relief should be denied.

A separate order will enter.

### ###